UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| AARIN NYGAARD, TERRANCE STANLEY,<br><br>Plaintiffs,<br><br>vs.<br><br>TRICIA TAYLOR, TED TAYLOR JR.,<br>JESSICA DUCHENEAUX, ED<br>DUCHENEAUX,  CHEYENNE RIVER SIOUX<br>TRIBAL COURT, BRENDA CLAYMORE, IN<br>HER OFFICIAL CAPACITY AS CHIEF<br>JUDGE, CHEYENNE RIVER SIOUX TRIBAL<br>COURT OF APPEALS; THE SOUTH<br>DAKOTA DEPARTMENT OF SOCIAL<br>SERVICES, TODD WALDO, IN HIS<br>OFFICIAL CAPACITY AS SOCIAL<br>WORKER; JENNY FARLEE, IN HER<br>OFFICAL CAPACITY AS SOCIAL WORKER;<br>CHEYENNE RIVER SIOUX TRIBAL COURT<br>OF APPEALS, FRANKLIN DUCHENEAUX,<br>ACTING CHIEF JUSTICE OF CHEYENNE<br>RIVER SIOUX TRIBAL COURT OF<br>APPEALS IN HIS OFFICIAL CAPACITY;<br><br>Defendants. | 3:19-CV-03016-RAL<br><br><br>OPINION AND ORDER GRANTING<br>TRIBAL DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT AND THE STATE<br>DEFENDANTS' MOTION TO DISMISS |

The central issue in this case is whether the Parental Kidnapping Prevention Act (the

PKPA), 28 U.S.C. § 1738A, applies to Indian tribes.  There is a split of authority on that question.

After reviewing the text of the statute, its purpose, and the authority on point, this Court determines

that the PKPA does not apply to Indian tribes.  As such, this Court grants Defendants Brenda

Claymore, the Cheyenne River Sioux Tribal Court of Appeals, and Franklin Ducheneaux's Motion

1

for Summary Judgment. Doc. 82. Defendants South Dakota Department of Social Services, Jenny Farlee, and Todd Waldo's Motion to Dismiss for Failure to State a Claim, Doc. 90, is granted as well.

## I.   Facts and Procedural History

The lengthy factual and procedural history of this case is summarized in this Court's Opinion and Order Denying Defendants' Motion to Dismiss. Doc. 69. This Court borrows a somewhat shortened account of the facts not subject to genuine dispute from that opinion and order and the settled record.[1]

Plaintiff Aarin Nygaard is the father of C.S.N., and Plaintiff Terrence Stanley is the father of T.R.S. Tricia Taylor (Tricia)[2] is the mother of both children and is an enrolled member of the Cheyenne River Sioux Tribe. Custody of C.S.N and T.R.S. has been the subject of multiple court proceedings in North Dakota state court and Tribal Court, dating back to early 2014.

Nygaard and Tricia were in a relationship, though they were never married and lived together in North Dakota. Doc. 1-1 at 1. From that relationship came a child, C.S.N., who was born in 2013. In March of 2014, Nygaard initiated a custody proceeding in the state district court for Cass County, North Dakota. Doc. 1-1. Among other things, Nygaard requested that the court award him primary residential responsibility of C.S.N. Doc. 1-1. Tricia filed an answer and counterclaim, requesting primary residential responsibility of C.S.N. Doc. 1-2. Tricia then filed a

---

[1] Much of the procedural facts mattered deeply to the question of tribal court exhaustion addressed by this Court in its opinion and order denying the Tribal Defendants' motion to dismiss. Doc. 69. However, the same undisputed facts reflect on the role, or lack of role, of the State Defendants in the children's "detention by order of an Indian Tribe" under 25 U.S.C. § 1303, the source of federal jurisdiction in this case.
[2] This Court uses "Tricia" rather than "Taylor" to refer to Defendant Tricia Taylor because there are two other defendants in this case with the last name Taylor.

motion for temporary relief asking the court to award her primary residential responsibility of C.S.N. while the custody proceeding was pending. Doc. 1-3.

In early July 2014, Tricia sought a temporary domestic violence restraining order against Nygaard. Doc. 1-4. On July 22, 2014, Nygaard and Tricia took part in a mediation about a temporary custody agreement during the pendency of the case and to address Tricia's petition for a restraining order. Nygaard and Tricia agreed to vacate Tricia's petition for a restraining order and replace it with a mutual no-contact order, which the North Dakota state court entered on that same day. Doc. 1-5. Nygaard and Tricia also agreed to equally share decision-making and residential responsibility over C.S.N. while the custody proceedings remained pending. Doc. 1-6. As a part of that agreement, Nygaard and Tricia committed to give one another 24-hour advance notice if either party intended to travel out of state with C.S.N. Doc. 1-6 at ¶ 2. On July 25, 2014, the North Dakota state court entered an interim order to that effect. Doc. 1-7.

The agreed-upon arrangement went awry on August 28, 2014. Without giving advance notice to Nygaard or obtaining court approval, Tricia took C.S.N. to the Cheyenne River Indian Reservation in South Dakota. Nygaard and Tricia had arranged to exchange C.S.N. on September 1, 2014, but Tricia failed to do so.

Tricia on September 2, 2014,[3] filed a Petition for Domestic Violence Protection Order against Nygaard in Cheyenne River Sioux Tribal Court ("Tribal Court") and included in her petition a request for full custody of C.S.N. Doc. 64-1 (Taylor v. Nygaard, Case No. 14DV059)[4]

---

[3] The relationship between Nygaard and Tricia by this point was very acrimonious with both reporting that the other had substance abuse issues and engaged in criminal activity.
[4] On the same day, September 2, 2014, Tricia separately filed a Petition for Emergency Custody, In re T.R.S. and C.S.N., Case No. 14FC282, in Tribal Court. Doc. 64-2 at 2. This Tribal Court case was not served on either Nygaard or Stanley. The file remained dormant until, following a

at 2–6; Doc. 1-8. On that same day, the Tribal Court issued a Temporary Protection Order against Nygaard.[5]  Doc. 64-1 at 7–12; Doc. 1-9.

Meanwhile in North Dakota state court, Nygaard filed an application for an ex parte order and a motion asking the court to hold Tricia in contempt for failing to comply with the July 25 interim order.  Doc. 1-11; Doc. 1-12.  On September 11, 2014, the North Dakota state court held a hearing on the motion; Tricia was not present and likely was unaware of the hearing.  The North Dakota state court on September 12, 2014, issued an ex parte order determining that Nygaard and C.S.N.'s home state was North Dakota, ordering Tricia to return C.S.N. to North Dakota and into the custody of Nygaard, and placing immediate temporary care, custody and control with Nygaard until the court ordered otherwise.  Doc. 1-13.

On September 24, 2014, Nygaard filed in Tribal Court a Petition to Enforce Foreign Judgment of Custody and Visitation, attaching the North Dakota court's September 12 ex parte order granting Nygaard full temporary custody and ordering Tricia to return C.S.N.  Doc. 64-3 at 2–6 (Nygaard v. Taylor, Case No. 14Cl 1 7); Doc. 8 at ¶ 34; Doc. 1-14.  Tricia received service of the petition in October of 2014.  Doc. 64-3 at 12.

The North Dakota state court held a hearing on the ex parte order on October 2, 2014.  Doc. 1-15.  Tricia received notice of the hearing but failed to appear.  Doc. 1-15.  On October 3, 2014, the North Dakota state court entered an Amended Interim Order, once again determining that Nygaard and C.S.N.'s home state was North Dakota, awarding Nygaard temporary full residential

---

December 19, 2018 hearing on remand from the Cheyenne River Sioux Tribal Court of Appeals, Doc. 64-2 at 5–12, findings of Fact of Cheyenne River Sioux Tribe Judge Curtis Carroll were filed on December 19, 2018, in this file as well as in 14FC391, 18FC149, and 18FC180.

[5] On October 8, 2014, Tricia once again petitioned the Tribal Court for a temporary protection order against Nygaard, which the Tribal Court granted.  Doc. 64-4 at 2–8 (Taylor v. Nygaard, Case No. 14DV070); Doc. 1-17.  Nygaard never received notice of the order and only became aware of this second protection order years later.  Doc. 1-17.

responsibility, and ordering Tricia to return C.S.N. to North Dakota and into the custody of Nygaard. Doc. 1-15. The court also found Tricia in contempt of court. Doc. 1-15. When Tricia still had not returned C.S.N. to North Dakota, the North Dakota court on October 20, 2014, issued a bench warrant for Tricia's arrest. Doc. 1-16. The Cass County Attorney also brought criminal charges against Tricia for parental kidnapping, and a warrant for her arrest on those charges issued. Doc. 1-18; Doc. 1-19. Nygaard filed the Amended Interim Order, the Bench Warrant, and other North Dakota case materials in the Tribal Court case where he was seeking to enforce the North Dakota custody decision. Doc. 64-3 at 21–39.

Stanley's efforts to obtain custody of T.R.S., the child that he and Tricia had together, began in North Dakota state court in July of 2014, separately from Nygaard's case, although Stanley and Nygaard later combined their efforts in Tribal Court. T.R.S. was born to Tricia and Stanley in 2007, and the couple married in 2010 but divorced in 2011. In 2012, Tricia filed an action in North Dakota state court for Cass County, seeking child support from Stanley, and the court entered a default judgment against Stanley ordering him to pay child support. Doc. 1-22. At that point, apparently no court order existed concerning custody of T.R.S., though it appears that T.R.S. lived with Tricia and Nygaard in North Dakota until their relationship soured.

Around July 2014, Tricia absconded with T.R.S. (along with C.S.N.), and Stanley was unable to locate them. Doc. 1-23. Stanley then initiated a child custody proceeding in the same North Dakota state court and later applied for and obtained an ex parte order granting him temporary custody of T.R.S. and ordering Tricia to return T.R.S. to Stanley's custody in North Dakota. Doc. 1-23; Doc. 1-24; Doc. 1-25; Doc. 1-26. The North Dakota state court held a hearing on the ex parte order on November 12, 2014. Tricia was served with notice of the hearing but did not appear. Thereafter, the North Dakota state court issued an interim order granting temporary

5

full residential custody of T.R.S. to Stanley and ordering Tricia to immediately return T.R.S. Doc. 1-27.

On November 26, 2014, Tricia was arrested by the Federal Bureau of Investigation (FBI) on the Cheyenne River Sioux Indian Reservation. Doc. 8 at ¶ 45; Doc. 1-67. The FBI agent enlisted the help of a criminal investigator of the Cheyenne River Sioux Tribe Law Enforcement Services, and someone in law enforcement asked the South Dakota Department of Social Services (DSS) to have social workers present at the time of Tricia's arrest for the children's welfare. Doc. 64-2 at 5–12. Tricia was taken into custody on a warrant arising from a Brookings County, South Dakota, misdemeanor bad check case;[6] she was appointed counsel there, and two weeks later agreed to waive fighting extradition to North Dakota in exchange for dismissal of the Brookings County charges. Doc. 64-2 at 7–8. Tricia then was transported to Cass County, North Dakota, to face state charges of parental kidnapping. Doc. 1-18.

At the time of Tricia's arrest, DSS placed C.S.N. and T.R.S. with Tricia's brother, Ted Taylor, Jr. (Ted). Doc. 8 at ¶ 45. DSS made this placement without contacting either Nygaard or Stanley. Doc. 8 at ¶ 45. Ted on December 1, 2014, filed a petition for custody of C.S.N. and T.R.S. in Tribal Court. Doc. 64-5 at 6–7 (In re C.S.N. and T.R.S., Case No. 14FC391);[7] Doc. 1-20. Ted's petition named only Tricia as the respondent, although it listed Nygaard and Stanley as the children's fathers. Doc. 64-5 at 6. In affidavits filed in Tribal Court, Ted and his sister (the children's aunt) Jessica Ducheneaux (Ducheneaux) made clear that Ted meant for Ducheneaux to have joint custody and that the children were staying with Ducheneaux in Timber Lake, South

---

[6] On the third appeal, the Tribal Court of Appeals and particularly Justice Franklin Ducheneaux's concurrence, expressed alarm at the mechanism by which Tricia was arrested on the Reservation. Doc. 64-16 at 124–45; see Doc. 64-13 at 33–36.

[7] Case No.14FC391 became the main case where the parties filed pleadings, with a record containing 1,246 pages of material.

Dakota.[8] Doc. 64-5 at 11–12. On December 18, 2014, Tribal Court Chief Judge Brenda Claymore

granted temporary joint custody to Ted and Ducheneaux pending a hearing on January 12, 2015,

when custody would be further determined. Doc. 1-20 at 9; Doc. 64-5 at 13. Nygaard and Stanley

were not given notice of the temporary custody order nor the hearing scheduled for January 12.

Doc. 1-20 at 10. Tricia knew of the proceedings and wrote to the Tribal Court that she wanted her

sister Ducheneaux to have custody of the children. Doc. 64-5 at 15.

At a Tribal Court hearing on January 12, 2015, Ted testified that he applied for joint

temporary custody at DSS's direction but that Ducheneaux should have actual custody of the

children. Doc. 1-20 at 12. He also testified that he was unsure why the fathers were not contacted

by DSS to have the children placed with them instead of him when Tricia was arrested. Doc. 1-

20 at 12. On January 13, 2015, Chief Judge Claymore issued a temporary custody order granting

custody of the children to Ducheneaux until further order of the Tribal Court. Doc. 1-20 at 12–13;

Doc. 64-5 at 16–17. In that order, Chief Judge Claymore declared that the Tribal Court had both

subject matter and personal jurisdiction to hear the case. Doc. 1-20 at 12–13; Doc. 64-5 at 16–17.

Nygaard and Stanley did not learn of the temporary custody order until February 5, 2015, the date

on which the North Dakota state court held a hearing on Nygaard's motion for contempt.[9] At that

---

[8] Timber Lake is within the exterior boundaries of the Cheyenne River Sioux Tribe Reservation.
[9] After the hearing held on February 5, 2015, the North Dakota state court entered an order on contempt finding that Tricia remained in contempt of court because she refused to comply with the July 25 interim order and reveal the whereabouts of the children. Doc. 8 at ¶ 50; Doc. 1-28. The court ordered that she remain in custody until she complied with the court's order. Doc. 8 at ¶ 50; Doc. 1-28. Tricia ultimately pled guilty to parental kidnapping and was sentenced to a term of five years in custody with three years suspended. Doc. 8 at ¶ 52; Doc. 1-31. The information originally charged Tricia with parental kidnapping of both C.S.N. and T.R.S., though it is unclear if she pled guilty to kidnapping both children or only C.S.N. See Doc. 1-18; Doc. 1-31.

hearing, Nygaard and Stanley received a copy of the Tribal Court temporary custody order from Tricia's North Dakota criminal defense attorney.

On March 5, 2015, Nygaard through retained counsel filed a notice of appeal of the Tribal Court temporary custody order. Doc. 64-5 at 19–20; Doc. 1-20 at 14–16; Doc. 1-29. Although the notice of appeal named just Nygaard, the Brief of Appellants Aarin Nygaard and Terrance Stanley, Jr., and other matters filed make clear that counsel meant the appeal to be on behalf of both Nygaard and Stanley. Doc. 64-14 (Cheyenne River Sioux Tribe Court of Appeals No. 15A03) at 8–21, 102–03. Nygaard and Stanley on appeal argued that North Dakota had continuing and exclusive jurisdiction, that the Tribal Court lacked jurisdiction, and that the lack of notice to Nygaard and Stanley of the Tribal Court proceedings violated their due process rights. Doc. 1-20 at 16; Doc. 1-29; Doc. 1-30; Doc. 64-14 at 3–99.

On April 15, 2015, Chief Justice Frank Pommersheim of the Cheyenne River Sioux Tribal Court of Appeals ("Tribal Court of Appeals") issued a one-page order remanding the case to the Tribal Court for an immediate rehearing before Chief Judge Claymore in which Nygaard was to be given the full opportunity to participate. Doc. 1-32; Doc. 64-14 at 100. Appellants' counsel thereafter wrote to Chief Justice Pommersheim to ask for an amended order to include Stanley, but no amended order issued. Doc. 64-14 at 102–03. The Tribal Court of Appeals did not reach the merits of any issue in this first appeal.

The Tribal Court sent Nygaard a summons informing him that he was required to file an answer to the petition and that the new hearing was scheduled for May 11, 2015. Doc. 1-33; Doc. 64-5 at 25. Nygaard and Stanley responded to the petition by filing a motion to dismiss with legal argument and a request for a hearing on that motion. Doc. 1-34; Doc. 64-5 at 28–42. The motion to dismiss made three arguments: (1) the Indian Child Welfare Act (ICWA) was not applicable;

8

(2) the orders of the North Dakota state court were entitled to full faith and credit and enforcement by the Tribal Court under the PKPA and (3) the Tribal Court did not have subject matter or personal jurisdiction over Nygaard and Stanley. Doc. 1-34 at 1; Doc. 64-5 at 28.

Although the Tribal Court of Appeals had ordered the Tribal Court to hold an "immediate hearing," the Tribal Court postponed the hearing multiple times. Doc. 8 at ¶¶ 54, 56, 61; Doc. 1-36; Doc. 64-5 at 43–46, 71, 76; Doc. 1-37; Doc. 1-43; Doc. 64-6 at 2–3. In the order granting one of the continuances, Judge Claymore noted that the Tribal Court of Appeals, in Eberhard v. Eberhard, had held that the PKPA applied to the Tribal Court, though Judge Claymore thought the Tribal Court of Appeals might reconsider that decision so both parties should prepare to argue whether the PKPA applied. Doc. 1-43; Doc. 64-6 at 2–3. The Cheyenne River Sioux Tribe then sought and received leave to file an amicus curiae brief, additional briefing was filed, and a Tribal Court hearing on the motion to dismiss finally was held on October 29, 2015. Doc. 64-6 at 9–87.

Meanwhile, the child custody proceedings in North Dakota state court moved forward with separate court trials occurring in both Nygaard's and Stanley's cases. Doc. 8 at ¶¶ 57–58; Doc. 1-38; Doc. 1-39. Tricia was properly notified of the proceedings but being in jail in North Dakota at the time did not appear personally or through counsel. Doc. 1-38 at 1. In September 2015, the North Dakota state court issued separate Findings of Facts, Conclusions of Law and Order for Judgment awarding primary permanent residential responsibility of C.S.N. to Nygaard and of T.R.S. to Stanley, subject to Tricia's right to supervised parenting time. Doc. 1-38. The North Dakota state court entered final judgments in those cases in late September of 2015. Doc. 1-40; Doc. 1-42.

By the time the Tribal Court held its hearing on October 29, 2015, the North Dakota state

court had awarded Nygaard and Stanley primary permanent residential responsibility for C.S.N. and T.R.S. respectively. On December 22, 2015, the Tribal Court issued an order denying Nygaard and Stanley's motion to dismiss. Doc. 1-47; Doc. 54-6 at 79–87. The Tribal Court explained that there were two federal enactments relevant to whether the Tribal Court had jurisdiction: the PKPA and ICWA. Doc. 1-47 at 1; Doc. 54-6 at 79. The Tribal Court first discussed whether the PKPA applied. Doc 1-47 at 1–4; Doc, 54-6 at 79–83. The Tribal Court then turned to whether ICWA applied and determined that the Tribal Court had jurisdiction under ICWA because the case involved a foster care situation, not a parent-to-parent custody dispute. Doc. 1-47 at 4–5; Doc. 54-6 at 83–84. The Tribal Court believed that ICWA took precedence over the PKPA, and therefore, the Tribal Court need not decide whether the PKPA applied to impede the Tribal Court's jurisdiction. Doc. 1-47 at 5; Doc. 54-6 at 83.

Nygaard and Stanley filed a notice of appeal with the Tribal Court of Appeals on January 19, 2016. Doc. 1 at ¶ 68; Doc. 1-52; Doc. 64-5 at 89. On this second appeal, Nygaard and Stanley jointly filed a brief arguing that the Tribal Court lacked both subject matter and personal jurisdiction under ICWA, the PKPA, and otherwise. Doc. 8 at ¶ 68; Doc. 1-53; Doc. 64-15 (Tribal Court of Appeals Case No.16A01) at 32–46. The Tribe as amicus curiae filed a brief arguing for primary Tribal Court jurisdiction. Doc. 64-15 at 12–26, 51–63. One of the legal issues framed in the appeal was application of the Tribal Court of Appeals precedent of Eberhard v. Eberhard, 24 I.L.R. 6059 (Chy. R. Sx. Ct. App. Feb. 18, 1997), which had held that the PKPA extended to tribes, such that full faith and credit must be given, generally without modification, to a prior child custody decree issued by a court with jurisdiction upon satisfaction of certain other requirements of the PKPA.

10

On June 27, 2016, the Tribal Court of Appeals heard oral arguments from both parties. Doc. 8 at ¶ 9; Doc. 1-54. On September 1, 2016, the Tribal Court of Appeals issued a per curiam opinion declining to rule on the Tribal Court's jurisdiction under the PKPA or ICWA because the Tribal Court had not received evidence or made factual findings on matters such as whether North Dakota was the "home state" of these children under the PKPA, whether the children are "residents" of the Cheyenne River Indian Reservation under ICWA, or whether the children were kidnapped or brought illegally to the Reservation.[10] Doc. 1-55 at 4; Doc. 64-15 at 105. However, the court did find that Nygaard and Stanley were denied due process in the temporary custody proceeding when they were not notified of the hearing or given an opportunity to be heard. Without having decided the issue of Tribal Court jurisdiction, the Tribal Court of Appeals reversed and remanded the case to give Nygaard and Stanley an opportunity to be heard and to argue that the North Dakota state court custody orders be recognized in Tribal Court based on comity under a Tribal Council Resolution adopted in 1997. Doc. 1-55 at 5–8; Doc. 64-15 at 105–08. On that subject, the Tribal Court of Appeals wrote: "It is further noted that given the already lengthy proceedings in this case—now approaching almost two years—that resolution of comity issue shall be handled directly on remand and without the necessity of filing a new and independent action." Doc. 1-55 at 7; Doc. 64-15 at 107.

After remand, on September 20, 2016, Nygaard and Stanley requested that the Tribal Court hold an evidentiary hearing. Doc. 8 at ¶ 70; Doc. 1-56; Doc. 64-7 at 3. Through counsel Nygaard and Stanley submitted a proposed order for off-reservation visitation to which Ducheneaux

---

[10] On April 6, 2015, Tricia received a five-year sentence, with three years suspended, after she pleaded guilty to parental kidnapping in North Dakota state court. Doc. 1-34 at 92–93. That North Dakota criminal disposition record appears not to have been part of the Tribal Court records at the time of this second appeal to the Tribal Court of Appeals.

objected. Doc. 64-7 at 5–8. Chief Judge Claymore set a hearing on visitation rights to occur on October 27, 2016, and Nygaard and Stanley sought a continuance. Doc. 64-7 at 42–57. On November 10, 2016, Nygaard and Stanley filed a petition for a writ of habeas corpus in the United States District Court for the District of North Dakota against many of the same parties named in this action, including naming Chief Judge Claymore. Doc. 1-57. Nygaard and Stanley twice filed motions requesting the Tribal Court to stay the proceeding until the federal case was resolved. Doc. 1-58; Doc. 64-7 at 70, 77. Chief Judge Claymore declined to stay the case, but continued hearings on the issue of paternal visitation. Doc. 1-70; Doc. 1-71; Doc. 64-7 at 74–75; Doc. 64-8 at 59–61. Chief Judge Claymore appointed a guardian ad litem for the children in March of 2017. Doc. 64-8 at 62–63.

In the federal habeas corpus case in North Dakota, the Tribal Defendants filed a motion to dismiss under Rule 12, arguing lack of subject matter jurisdiction and Nygaard and Stanley's failure to exhaust tribal remedies. See Doc. 1-59 at 1. The U.S. District Court for the District of North Dakota granted the motion to dismiss without prejudice to refiling, finding that Nygaard and Stanley had failed to exhaust tribal remedies. Doc. 1-59 at 1. The federal court explained that more evidence was needed to determine whether the temporary custody order was a foster care placement, in which case ICWA applies, or a competing divorce custody order, in which case ICWA does not apply. Doc. 1-59 at 21–22. The court also concluded that, in any event, the factual record was not developed enough to determine whether the federal court had jurisdiction to issue the writ requested. Doc. 1-59 at 1–2, 22.

After the U.S. District Court for the District of North Dakota's dismissal of their petition, Nygaard and Stanley filed a petition for writ of mandamus with the Tribal Court of Appeals. Doc. 1-69; Doc. 64-8 at 74–76. In that petition, Nygaard and Stanley alleged that the Tribal Court failed

12

to set an evidentiary hearing in accordance with the Tribal Court of Appeals' opinion and order, but instead scheduled a hearing to determine the parents' visitation rights and then continued the hearing multiple times. Doc. 1-69; Doc. 64-8 at 74–76. Nygaard and Stanley requested that a special judge be appointed to conduct the evidentiary hearing and rule on the jurisdictional issues. Doc. 1-69; Doc. 64-8 at 74–76.

On July 20, 2017, the Tribal Court of Appeals denied the petition, noting that a hearing had been scheduled on July 24, 2017, to determine whether the North Dakota state custody orders should be granted comity. Doc. 1-60; Doc. 64-8 at 83–84. Nygaard and Stanley's counsel had objected to holding the hearing on July 24; they probably were unaware that the Tribal Court of Appeals days earlier had anticipated the hearing would be held as scheduled. Doc. 8 at ¶ 73; Doc. 1-61 at 1; Doc. 64-8 at 86–88. Neither Nygaard and Stanley nor their counsel appeared at the July 24 hearing. Doc. 1-61 at 1. The Tribal Court dismissed without prejudice any request to grant comity to the North Dakota orders because Nygaard and Stanley had failed to appear in Tribal Court to present evidence that notice and due process were afforded to Tricia by the North Dakota state court. Doc. 1-61 at 3; Doc. 54-8 at 88–90. The Tribal Court left its visitation order in place. Doc. 54-8 at 90.

Nygaard and Stanley then pursued different approaches in Tribal Court proceedings for a few months. Stanley terminated the attorney he shared with Nygaard and, contrary to that attorney's advice, exercised visitation with T.R.S. on the Reservation on terms set by the Tribal Court.[11] Doc. 54-8 at 92–96. Meanwhile, Nygaard through counsel filed a Motion for Hearing Date on the jurisdictional issues on August 22, 2017. Doc. 64-8 at 100. On September 21, 2017,

_____

[11] Tribal Court records indicate that the initial visitation between Stanley and T.R.S. went well, but Ducheneaux later raised concerns to the Tribal Court about Stanley's behavior and ongoing visitation with T.R.S. Doc. 64-8 at 114–15, 118, 131–33.

Tricia filed her own Petition for Temporary/Permanent Custody in Tribal Court. Doc. 64-8 at 111–13. Ducheneaux opposed Tricia's request, and nothing in the Tribal Court record suggests that it was granted.

On November 14, 2017, Nygaard filed in the main Tribal Court file 14FC391 a comprehensive pleading arguing again the lack of Tribal Court jurisdiction, requesting a hearing, and attaching 100 documents. Doc. 64-9 at 2–150; Doc 64-10 at 1–150; Doc 64-11 at 1–112. Unlike with previous briefing in the Tribal Court record, these attachments in the Tribal Court record include all of the North Dakota court's custody orders concerning C.S.N.: 1) the Interim Custody Order of July 24, 2014, Doc, 64-9 at 73–77; 2) the Ex Parte Order of September 12, 2014, Doc. 64-9 at 98–100; 3) the Amended Interim Order, Doc. 64-9 at 104–09; and 4) the Findings of Fact, Conclusions of Law and Order for Judgment and Judgment after the 2015 trial in North Dakota, Doc. 64-9 at 129–45. The filings also contain information on Tricia's legal issues in North Dakota state court. In short, after she was eligible for parole on her sentence for parental kidnapping, an Amended Order on Contempt held her in custody until the Supreme Court of North Dakota on September 20, 2017, reversed and ordered her immediate release because she had been held longer than the statutory six months for civil contempt. Doc. 64-10 at 3–38. Tricia left for the Cheyenne River Indian Reservation after her release and thereby appeared to be violating her North Dakota state parole conditions.

Separately, on March 21, 2018, Stanley acting pro se filed in the main Tribal Court file 14FC391 a Petition to Enforce Foreign Judgment of Custody and Visitation, to which he attached the most recent North Dakota state judgment under which he claimed custody of T.R.S. Doc. 64-12 at 173–81. Thus, unlike at the time of the second Tribal Court of Appeals decision or the U.S. District Court for the District of North Dakota's dismissal of that habeas corpus action, by March

14

21, 2018, both Nygaard and Stanley had filed the North Dakota state court custody orders and sought Tribal Court recognition of them. The Tribal Court judge who next ruled on issues under ICWA and PKPA and in turn Tribal Court jurisdiction was Judge Erin Shanley.

Judge Shanley heard from the parties and issued an order containing findings of fact and conclusions of law on April 18, 2018. Doc. 1-62; Doc. 64-12 at 185–98. Judge Shanley began by noting that the remand from the Tribal Court of Appeals on September 1, 2016, required findings regarding whether North Dakota was the "home state" of the children under the PKPA; whether the children were "residents" of the Reservation under ICWA; and whether the children were kidnapped or brought illegally to the Reservation. Doc. 1-62 at 1; Doc. 64-12 at 185. After making factual findings, Judge Shanley concluded that ICWA did not govern because ICWA only applies when the Indian child resides or is domiciled within the reservation and the children here resided or were domiciled in Fargo, North Dakota, before being brought to the Cheyenne River Sioux Indian Reservation illegally. Doc. 1-62 at 6–9; Doc. 64-12 at 190–93.

Judge Shanley next concluded that the PKPA applied to the Tribal Court based on the Tribal Court of Appeals' decision in Eberhard v. Eberhard, 24 I.L.R. 6059 (Chy. R. Sx. Tr. Ct. App. Feb. 18, 1997). Doc. 1-62 at 10; Doc. 64-12 at 195. As such, the PKPA deprived the Tribal Court of jurisdiction to entertain the petition for temporary custody and prevented the Tribal Court from modifying prior North Dakota state court custody orders. Doc. 1-62 at 9–11; Doc. 64 at 194–96. Finally, Judge Shanley denied Nygaard's September 24, 2014 petition to recognize the North Dakota state court's ex parte order, reasoning that the order was not entitled to comity under tribal law because Tricia was not given an opportunity to be heard on that ex parte order. Doc. 1-62 at 11–12; Doc. 64 at 196–97.

15

Ducheneaux appealed Judge Shanley's order and sought an emergency stay to ensure that the children remained in her care during the pendency of the appeal. Doc. 64-13 at 1–5; Doc. 64-16 at 2–6 (Tribal Court of Appeals No. 64-16).[12]  Material in the Tribal Court record indicates that Ducheneaux has provided good care of T.R.S. and C.S.N. Judge Shanley on May 3, 2018, granted the motion for stay pending appeal. Doc 64-13 at 6; Doc 64-16 at 8.

On May 14, 2018, the Cheyenne River Sioux Tribal Council adopted a tribal resolution overruling Eberhard, the Tribal Court of Appeals opinion holding that the PKPA applies to tribes. Doc. 1-63.  The tribal resolution declared that "the Cheyenne River Sioux Tribe is not a "State" within the meaning of the [PKPA] . . . and is not subject to the Act's obligations." Doc. 1-63 at 5. The tribal resolution continued that "custody and visitation orders and judgements of foreign Tribal and State courts may be recognized and enforced by the Cheyenne River Sioux Tribal Courts under the principles of comity. . . not under principles of full faith and credit." Doc. 1-63 at 6.

The Tribal Court of Appeals issued a briefing scheduling order and allowed the Tribe to file an amicus curiae brief.  The Tribal Court of Appeals denied motions of Nygaard and Stanley to reverse the stay pending appeal and to dismiss the appeal when Ducheneaux missed her deadline to file a brief. Doc. 1-64; Doc. 64-14 at 1, 18–21, 48–51. As part of its September 24, 2018, Memorandum Opinion and Order setting a new briefing schedule, the Tribal Court of Appeals remanded the case, noting that more than Tribal Court jurisdiction was at stake; the Tribal Court of Appeals directed that the guardian ad litem prepare a written report on the status and wellbeing of the children and that the trial court conduct a prompt hearing to receive evidence and issue

---

[12] Ducheneaux also petitioned for temporary/permanent custody on May 2, 2018, which resulted in a new Tribal Court file being opened, although little activity occurred in that case. Doc. 64-17 (18FC149) at 1–31.  On June 1, 2018, Tricia petitioned for visitation, resulting in another Tribal Court case being opened, in which there has been almost no activity. Doc. 64-18 (18FC180) at 1–32.

findings of fact about the involvement of the FBI in effectuating Tricia's arrest and of the DSS in removing the children from Tricia in 2014. Doc. 1-64 at 1–4; Doc. 64-16 at 48–51.

On December 19, 2018, Tribal Judge Curtis Carroll held the hearing contemplated on remand. Doc. 1-68; Doc. 64-13 at 33–36. Tricia and Ducheneaux personally appeared at the hearing along with counsel; Nygaard appeared at the hearing through counsel only, and Stanley did not appear at all. Doc. 1-68 at 1; Doc 64-13 at 33–36. At the hearing, Judge Carroll heard testimony from Cheyenne River Sioux Tribe Detective Larry LeBeau, Guardian *Ad Litem* Carmen O'Leary, former DSS caseworker Jenny Farlee, and Tricia. Doc. 1-68 at 1. The Tribal Court then made findings of fact concerning the North Dakota custody proceedings, Tricia's allegations of abuse against Nygaard, her arrest, and DSS's placement of the children with Ted. See Doc. 1-68; Doc. 64-13 at 33–36. The findings of fact largely focused on questions concerning Tricia's arrest and lack of notice of certain North Dakota hearings, but the findings of fact include: "There are North Dakota custody orders that award custody of the minor children to their fathers." Doc. 1-38 at 2; Doc. 64-13 at 34.

The evidentiary hearing having been conducted, the Tribal Court of Appeals consolidated briefing and heard oral arguments on Ted and Ducheneaux's appeal on January 4, 2019. Doc. 1-65 at 10; Doc. 64-16 at 26–40, 52–61, 75–90, 91–99. The Tribal Court of Appeals then issued its opinion and order on February 25, 2019. Doc. 1-65; Doc. 64-16 at 124–44. The Tribal Court of Appeals identified three issues on appeal—whether the PKPA controls and, if so, whether North Dakota is the "home state" under that statute; whether ICWA controls jurisdiction to place jurisdiction with the Tribal Court; and whether there is an independent source of Tribal Court jurisdiction. Doc. 1-65 at 10; Doc. 64-16 at 133. The court first overruled its decision in Eberhard and held that the PKPA does not apply to Indian tribes. Doc. 1-65 at 10–17; Doc. 64-16 at 133–

140. It then determined that ICWA did not apply in either forum because the North Dakota custody dispute was between parents where ICWA does not govern and because ICWA is meant to apply in state and not in tribal courts. Doc. 1-65 at 17–19; Doc. 64-16 at 140–42.

Having concluded that neither the PKPA nor ICWA applied, the Tribal Court of Appeals reasoned that the Tribal Court had jurisdiction under the Tribal Code. Doc. 1-65 at 19–20; Doc. 64-16 at 142–43. Under C.R.S.T. Children's Code § 7.01, the Tribal Court "shall have jurisdiction over any child who is a member or eligible to become a member of the Cheyenne River Sioux Tribe no matter where domiciled, residing or found." Doc. 1-65 at 19; Doc. 64-16 at 142. Section 7.01 further provides that the Tribal Court "may decline jurisdiction where a forum with concurrent jurisdiction is exercising its authority or in cases where neither the child nor either parent is a Reservation resident in cases where justice may require declination." Doc. 1-65 at 19; Doc. 64-16 at 142. The Tribal Court of Appeals reversed and remanded the case to the Tribal Court for an "immediate" rehearing to review the status of parental visitation and whether the current temporary award of custody to Ducheneaux was still in the best interests of the children. Doc. 1-65 at 20; Doc. 64-16 at 143. Nygaard and Stanley allege that at the time when they filed this petition, the Tribal Court still had not notified them of a hearing date or held a hearing. Doc. 8 at ¶ 78.

On August 28, 2019, Nygaard and Stanley filed a petition for writ of habeas corpus against the Tribal Defendants and others in this Court. Doc. 1. Nygaard and Stanley have since amended their petition. Doc. 8. After a lengthy delay in getting Defendants served, the Tribal Defendants, in 2021, filed a motion to dismiss for lack of subject matter jurisdiction and failure to exhaust tribal court remedies. Doc. 42. This Court on September 24, 2021, denied that motion to dismiss, Doc. 69, and set a briefing schedule on the seminal issue of whether the PKPA applies in tribal courts, such that the Tribe must recognize and enforce the North Dakota custody orders, Doc. 73.

In the habeas action before this Court, Nygaard and Stanley (collectively "Fathers") allege that the Cheyenne River Sioux Tribe and its named representatives ("the Tribal Defendants") lacked jurisdiction to issue custody orders over their children, among other reasons, because the PKPA applies to tribal courts. Doc. 69 at 1–2; Doc. 79 at 1. Fathers also named the South Dakota Department of Social Services, and child protection workers Jenny Farlee and Todd Waldo (collectively "the State Defendants"), as defendants in this habeas action. Fathers argue that the State Defendants are appropriate parties because they worked with the Tribal Defendants to change the physical custody of the children between Tricia and her brother Ted. Doc. 8 at 6; Doc. 101 at 6.

Consistent with this Court's order, the Tribal Defendants and Fathers have now submitted cross motions for summary judgment, Docs. 77, 82, and the State Defendants have filed a motion to dismiss for failure to state a claim, Doc. 90. This Court first addresses the State Defendants' Motion to dismiss before considering the dispositive issue of whether the PKPA applies to tribes and tribal courts.

## II.     The State Defendants' Motion to Dismiss for Failure to State a Claim

### A. Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to bring a motion for dismiss for "[f]ailure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned up and citation omitted). "Threadbare recitals of the elements of a cause of action,

19

supported by mere conclusory statements, do not suffice." Glick v. W. Power Sports, Inc., 944
F.3d 714, 717 (8th Cir. 2019) (citation omitted).

**B. Discussion**

Fathers invoke federal question jurisdiction under 28 U.S.C. § 1331 by bringing this habeas
corpus action based on 25 U.S.C. § 1303. Section 1303 is part of the Indian Civil Rights Act
(ICRA) and provides that the "privilege of the writ of habeas corpus shall be available to any
person, in a court of the United States, to test the legality of his detention by order of an Indian
Tribe." 25 U.S.C. § 1303. This Court previously explained why this statute authorized a habeas
corpus claim against Tribal Defendants at length in its opinion and order denying Tribal
Defendants' motion to dismiss but did not address whether a claim under § 1303 may be brought
against non-Tribal defendants. Doc. 69 at 26–31.

Both the Amended Complaint and the undisputed material facts make clear that the State
Defendants' involvement in this case was limited to placing the children with Tricia's brother Ted
upon Tricia's arrest on the Brookings County warrant in November of 2014, which led to her
extradition to North Dakota on parental kidnapping charges. Doc. 8 at ¶¶ 1, 3, 9–20, 46–47, 80–
81. Fathers named the State Defendants because of their role in placing the children with Ted
back in 2014. There is nothing in the Amended Complaint or record suggesting the State
Defendants have any custody or control over the children presently. Rather, the Cheyenne River
Sioux Tribal Court rulings placing the children with Tricia's sister Ducheneaux caused the
children's "detention" by order of an Indian Tribe actionable under 25 U.S.C. § 1303. Relief under
§ 1303 cannot be granted against a party who lacks any custody or control over the individual or
individuals being detained by order of an Indian Tribe. Wells v. Philbrick, 486 F. Supp. 807, 809
(D.S.D. 1980).

Fathers fail to cite any case other than <u>DeMent v. Oglala Sioux Tribal Court</u>, 874 F.2d 510,

513 n.3 (8th Cir. 1989), in support of their opposition to the State Defendants' motion to dismiss.

Doc. 101. But nothing in <u>DeMent</u>, discussed at length in this Court's opinion and order denying

the Tribal Defendants' motion to dismiss, Doc. 69, suggests that § 1303 could be used as a vehicle

to sue parties other than a tribal court and its named representatives. In <u>DeMent</u>, the United States

Court of Appeals for the Eighth Circuit dealt with facts similar to the custody dispute in this case.

There, three children lived in California with a non-Indian father and a mother who was enrolled

in the Oglala Sioux Tribe. 874 F.2d at 511–12. After the couple's relationship soured, the father

received a favorable custody decision from a California state court. <u>Id.</u> The mother, then living

with the children on a reservation, responded by filing a separate custody action in Oglala Sioux

Tribal Court. <u>Id.</u> at 512. The Oglala Sioux Tribal Court refused to enforce the California state

court order and awarded custody to the mother. <u>Id.</u> On appeal, the Eighth Circuit held that the

father had a viable claim for habeas relief against the Oglala Sioux Tribal Court representatives

under § 1303 after he exhausted tribal court remedies. <u>Id.</u> at 515–17. <u>DeMent</u> did not consider or

suggest that § 1303 could be used to sue a non-tribal court defendant. Further, this Court has found

no authority allowing a § 1303 claim against anyone lacking custody or control over the person

under detention. Indeed, the very language of § 1303 extends the writ "to test the legality of [the]

detention by order of an Indian Tribe." 25 U.S.C. § 1303.

As such, the State Defendants are not necessary or proper parties to this case. There is no

viable claim against them under § 1303, because the Tribal Defendants and the Tribal Court orders,

not the State Defendants, are the obstacles to enforcement of the North Dakota custody rulings to

release the children from what qualifies under <u>DeMent</u> as detention actionable under 25 U.S.C. §

1303. The State Defendants' motion to dismiss is granted. Further, the grant of the Tribal

Defendants' motion for summary judgment provides a secondary justification for dismissal of the State Defendants.

### III. The Tribal Defendants and Fathers' Cross Motions for Summary Judgment

### A. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005). "Whether the term 'territories' in the PKPA applies to Indian tribes" and in turn whether the PKPA applies to Indian tribes "is a question of federal law." DeMent, 874 F.2d at 514 n.4.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Gundy v. United States, 139 S. Ct. 2116, 2126 (2019) (citations omitted). A court does not construe statutory text in a vacuum, but rather takes "account for both the specific context in which language is used and the broader context of the statute as a whole." Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 321 (2014) (cleaned up and citation omitted). "[B]eyond context and structure," a court may look to the "history and purpose" of a statute to divine its meaning. Gundy, 139 S. Ct. at 2126 (cleaned up and citation omitted). In interpreting a statute, a court's "task is to give effect to the will of Congress." Negonsott v. Samuels, 507 U.S. 99, 104 (1993). A court is "not at liberty to rewrite [a] statute to reflect a meaning [it] deem[s] more desirable. Instead, [it] must give effect to the text

Congress enacted." <u>Ali v. Fed. Bureau of Prisons</u>, 552 U.S. 214, 228 (2008) (footnote omitted); <u>see also</u> <u>United States v. Great N. Ry. Co.</u>, 343 U.S. 562, 575 (1952) (holding that courts are "to apply statutes on the basis of what Congress has written, not what Congress might have written").

Another "fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979). Where Congress has expressed its intent "in reasonably plain terms, that language must ordinarily be regarded as conclusive." <u>Negonsott</u>, 507 U.S. at 104. But if a statute contains an ambiguous term or phrase, courts may "consult contemporaneous usages, customs, and practices to the extent they shed light on the meaning of the language in question at the time of enactment." <u>McGirt v. Oklahoma</u>, 140 S. Ct. 2452, 2468 (2020).

**B. The PKPA**

Before the PKPA was enacted in 1980, the "law in many States encourage[d] a parent who d[id] not have custody to snatch [a] child from the parent who d[id] and take the child to another State to relitigate the custody issue in a new forum. This kind of 'forum shopping' [wa]s possible because child custody orders are subject to modification to conform with changes in circumstances." <u>Thompson v. Thompson</u>, 484 U.S. 174, 181–82 (1988). The PKPA was enacted to prevent this relitigation of these child custody orders by "impos[ing] a duty on states to enforce a valid child custody determination entered by a sister state. Once a state exercises jurisdiction over a custody dispute," the PKPA provides that "no other state may exercise concurrent jurisdiction and all states must accord full faith and credit to a sister state's custody decree." <u>DeMent</u>, 874 F.2d at 513 n.3; <u>see also</u> <u>Thompson</u>, 484 U.S. at 181 (stating that "[t]he context of the PKPA therefore suggests that the principal problem Congress was seeking to remedy was the inapplicability of full faith and credit requirements to custody determinations").

The PKPA applies to "states," which it defines as: "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States." 28 U.S.C. § 1738A(b)(8).  There is no mention of Indian Tribes anywhere in the PKPA, and no evidence in the PKPA's legislative history that Congress considered whether the statute would apply to tribes and tribal courts.  28 U.S.C. § 1738A; Garcia v. Gutierrez, 217 P.3d 591, 604 (N.M. 2009); John v. Baker, 982 P.2d 738, 762 (Alaska 1999); In re Marriage of Susan C. & Sam E., 60 P.3d 644, 648–49 (Wash. Ct. App. 2002).

Whether the PKPA applies to tribes and tribal court orders is the dispositive issue in this § 1303 habeas action.  Courts have split on that question.  Fathers claim that Indian tribes are a "territory or possession of the United States" under the PKPA.  Doc. 79 at 14–16; Doc. 83 at 10–14.  If the PKPA applies to the Tribal Defendants and thereby requires them to give full faith and credit to the North Dakota state court custody orders, then Fathers are entitled to some relief under § 1303.  Doc. 73 at 1; Doc. 79 at 1, 9.  If the PKPA does not apply to Indian tribes, then the Tribal Defendants "are not bound to give full faith and credit, under the PKPA, to state-court judgments [concerning child custody] in state-court cases" and may exercise independent jurisdiction to reach a different result than what the North Dakota state court has ruled.  Garcia, 217 P.3d at 604.

Fathers' argument for applying the PKPA to tribal courts is not without some support in case law.  Some courts have relied on a general geographic definition of "territory," as land within a jurisdiction's borders, to conclude that Indian Tribes are a "territory" as defined in the PKPA.  See Eberhard, 24 ILR at 6054–55; Doc. 1-66 at 6–7; In re Montclair, No. CC-C-2008-037, 2008 WL 7903915, at *3–4 (Stand. R. Sx. Trib. Ct., June 9, 2008) (relying on a definition of territory as a "geographical area included within a particular government's jurisdiction; the portion of the earth's surface that is in a state's exclusive possession and control").  In U.S., to Use of Mackey

24

v. Coxe, the Supreme Court applied similar reasoning to hold that the Cherokee Nation was a territory, among other reasons, because it was located within the geographic borders of the United States. Mackey, 59 U.S. 100, 103–04 (1855). Relying on the authority originally set forth in Mackey, a "series of 19th century opinions by the Eighth Circuit [also] held that Indian tribes were territories under the then-existing full faith and credit statute." Garcia, 217 P.3d at 605 (citing Cornells v. Shannon, 63 F. 305, 306 (8th Cir. 1894); Standley v. Roberts, 59 F. 836, 845 (8th Cir. 1894); Mehlin v. Ice, 56 F. 12, 19 (8th Cir. 1893)). [13]

In re Larch, 872 F.2d 66 (4th Cir. 1989), the Fourth Circuit also held that the PKPA applied to Indian tribes. Id. at 68. The Fourth Circuit reached this holding by analogizing Indian tribes and territories, relying only on general "authority that Indian courts owe full faith and credit to state court judgments on the same basis as do territorial courts" in some circumstances. Id. Some courts have relied on Larch to hold that the PKPA applies to tribal courts. See, e.g., In re Marriage of Susan C. & Sam E., 60 P.3d at 648–49; Ex parte Rich, 953 So. 2d 409, 412 (Ala. Civ. App. 2006); Blandino v. Blandino, 52 Va. Cir. 572 (Va. Cir. Ct. 1999).

Most of these decisions applying the PKPA to tribal courts do so without much reasoning or explanation. The case with the most thorough analysis applying the PKPA to tribes was, somewhat ironically, from the Cheyenne River Sioux Tribal Court of Appeals in Eberhard v. Eberhard. In Eberhard, the tribal appeals court acknowledged that there was no reference to Indian tribes within the text of the PKPA, but nonetheless believed "that Congress intended the PKPA to

---

[13] One commentator observed that the statement in Mackey equating a tribe with a territory is dicta. William V. Vetter, Of Tribal Courts and "Territories" Is Full Faith and Credit Required?, 23 CAL. W. L. REV., 219, 225–26 (1987). Likewise, the Eighth Circuit's statements that the judgments of Indian Tribes and "territories" were entitled to the "same full faith and credit" in Standley and Mehlin were dicta, and recently the Eighth Circuit has "not followed the Mehlin line of cases." Id. at 227–28 (cleaned up).

deliberately omitted Indian tribes from the PKPA. Doc. 80-40 at 3–4. The council then stated that "the *Eberhard* decision is contrary to the plain language of the [PKPA]" and noted that "most Federal, State, and Tribal courts have held that Indian Tribes are not included within the full faith and credit provisions of the PKPA or the more general Full Faith and Credit Act, 28 U.S.C. § 1738." Doc. 80-40 at 4. Instead, "most Tribes and States use comity, as opposed to full faith and credit, to recognize and enforce foreign Tribal court orders, and most Tribal courts use comity to recognize and enforce foreign State court orders." Doc. 80-40 at 4. In 2019, in a case involving custody over these same children, the Cheyenne River Sioux Court of Appeals issued an opinion reversing Eberhard on the same grounds. Doc. 1-65 at 11–17; Doc. 69 at 22. The opinion ultimately concluded that the Cheyenne River Sioux Tribe was not required to give full faith and credit to the North Dakota state custody orders of C.S.N. and T.R.S. See Doc. 1-65 at 20; Doc. 69 at 22.

As recognized by the Cheyenne River Sioux Tribal Council and cited by the Tribal Defendants, a number of state and tribal courts have concluded that the PKPA does not apply to Indian tribes. These decisions turn on the absence of mention of Indian tribes in the PKPA. For instance, the Supreme Court of New Mexico noted that the "PKPA nowhere states that tribes are to be treated as states, and in fact, the words 'tribe' and 'Indian' are entirely absent." Garcia, 217 P.3d at 604. Other courts simply reject that Indian tribes are encompassed by the PKPA's definition of "state." For example, the Supreme Court of Alaska declared "that Congress does not view Indian tribes as 'states, territories or possessions'" and reasoned then that the PKPA does not apply to Indian Tribes. Baker, 982 P.2d at 762; see also In re Custody of Sengstock, 477 N.W.2d 310, 314 (Wis. Ct. App. 1991) ("[B]ecause the tribe is not a state, territory, possession or commonwealth, the judgments and orders of its tribal court are not entitled to 'full faith and credit'

under . . . 28 U.S.C. §§ 1738, 1738A."); <u>Miles v. Chinle Fam. Ct.</u>, 7 Am. Tribal Law 608, 613 (Navajo Feb. 21, 2008) ("The PKPA does not include Indian tribes in its definition of 'State,' <em>see</em> 28 U.S.C. § 1738A(b)(8), and consequently does not bind the [Navajo] Nation."); <u>Mother H v. Father H</u>, No. MPTC-CV-FR-2017-131, 2017 WL 3039105, at *3 (Mash. Pequot Tribal Ct. June 28, 2017) ("By the clear terms of 28 U.S.C. § 1738A, this federal statute does not apply to Native American tribes."); <u>Tupling v. Kruse</u>, 15 Am. Tribal Law 23, 26, 2017 WL 2443081 (Colville C.A. June 5, 2017) (holding the PKPA does not apply to a tribe); <u>In re Custody of C.M.A.</u>, 3 Am. Tribal Law 336, 343, 2001 WL 36152576 (Fort Peck C.A. Oct. 24, 2001) (same).

Several of these courts have inferred that Congress deliberately omitted Indian tribes from the PKPA because Congress expressly stated that full faith and credit applies to a "territory or possession of the United States" <em>and</em> "Indian tribes" in other statutes. For instance, in <u>Baker</u>, the Supreme Court of Alaska reasoned that "ICWA's full faith and credit provision [extending to "every territory or possession of the United States, and every Indian tribe"] reveals that Congress does not view Indian tribes as 'states, territories or possessions[. Therefore,] the PKPA does not accord full faith and credit to tribal judgments." <u>Baker</u>, 982 P.2d at 762; 25 U.S.C. § 1911(d). Similarly, in <u>Garcia</u>, the Supreme Court of New Mexico reasoned that "[t]he explicit inclusion of tribes in" 25 U.S.C. § 1725(g) (judicial proceedings of the Passamaquoddy Tribe, Penobscot Nation, and State of Maine); § 1738(B) (child support orders); 18 U.S.C. § 2265(a) (2000) (Violence Against Women Act); and 25 U.S.C. § 1911(d) (2000) (Indian Child Welfare Act) "strongly suggests that Congress not only considers it necessary to specify when legislation is meant to apply to tribes, but also that Congress is capable of doing so when it desires." <u>Garcia</u>, 217 P.3d at 605. <u>See also</u> <u>In re Custody of C.M.A.</u>, 3 Am. Tribal Law at 343 ("It is our belief that

28

when the U.S. Congress enacted 1738A it deliberately omitted Indian Country," while "Indian Country was expressly included in 1738B [governing child support orders.]").

It is fairly debatable, as the split in authority reveals, whether Indian tribes are a "territory or possession of the United States" under the PKPA, so this Court deems "territory or possession of the United States" as used in the PKPA to be ambiguous. See also William V. Vetter, *Of Tribal Courts and "Territories" Is Full Faith and Credit Required?*, 23 CAL. W. L. REV., 219, 237 (1987) (stating that the "meaning of the word 'territory' in a statute can and does vary."). After all, "territory or possession of the United States" could be read narrowly to be confined to what is commonly understood as a United States territory, such as Guam, the Northern Mariana Islands, the United States Virgin Islands, and the various other Pacific and Caribbean islands that are directly controlled by the United States but have their governance as well. See *Definitions of Insular Area Political Organizations*, U.S. DEP'T OF THE INTERIOR, https://www.doi.gov/oia/islands/politicatypes (last visited April 28, 2022) (defining a territory as an "unincorporated United States insular area" and listing the thirteen current United States territories; *Territory*, MERRIAM-WEBSTER, https://www.merriamwebster.com/dictionary/territory (lasted visited Feb. 11, 2022). Or, as in Mackey, the words "territory or possession of the United States" could be read expansively to cover any area not under state jurisdiction but under the dominion or within the bounds of the United States, which could include the quasi-sovereign American Indian tribes and their courts. Therefore, this Court looks to the ordinary meaning of "territory or possession of the United States" when the PKPA was enacted in 1980 to determine

its meaning. See Perrin, 444 U.S. at 42–43 (holding that courts interpret a statute by looking at the ordinary meaning of the words in the statute when it was enacted).[14]

"Territory" may refer to land within a government's jurisdiction, or more specifically, to a political entity under the jurisdiction of the United States government but which lacks some of the privileges and characteristics of states. *Territory*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/territory (lasted visited Feb. 11, 2022). The United States Supreme Court has long distinguished territories, as political entities, from states. "[A] territorial government is entirely the creation of Congress. . . ." United States v. Wheeler, 435 U.S. 313, 321 (1978). Unlike states, territorial courts derive their power from the federal government. Id. at 320–21 (collecting cases); see also Puerto Rico v. Sanchez Valle, 579 U.S. 59, 71–72 (2016) (discussing federal and territorial prosecutors). The term "possession," appears to be synonymous with "territory" in this context. *Definitions of Insular Area Political Organizations*, U.S. DEP'T OF THE INTERIOR, https://www.doi.gov/oia/islands/politicatypes (last visited April 28, 2022). "Although [possession] still appears in statutes and regulations, . . . [it] is no longer current colloquial usage" and was not in colloquial usage at the time the PKPA was enacted. Id; see Wheeler, 435 U.S. 313 (referring to "territories" without any reference to "possession[s]" of the United States); Sanchez Valle, 579 U.S. 59 (same); cf Torres v. Puerto Rico, 442 U.S. 465, 470 (1979) (using the terms "unincorporated territories" and "possessions" interchangeably).

---

[14] In DeMent, the Eighth Circuit declined to reach whether the PKPA applies to Indian tribes and suggested that it remained an open question. The court noted that "[t]he Supreme Court has construed the term 'territories' in an earlier statute to include Indian tribes, [citing Mackey] . . ., and [the Eighth Circuit] has also reached that conclusion. . . . On the other hand, an analysis of the legislative history may show that Congress did not intend for the PKPA to apply to Indian tribes." DeMent, 874 F.2d at 514 n.4 (cleaned up and citation omitted).

The Supreme Court has long distinguished Indian tribes from territories and states. "Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 788 (2014) (citations omitted); see also Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831) (stating that tribes may "be denominated domestic dependent nations"). Like states, tribes have "inherent power to prescribe laws for their members and to punish infractions of those laws." Sanchez Valle, 579 U.S. at 70. And unlike territories, Indian tribes possess inherent sovereignty from their existence before the creation of the federal government. See Wheeler, 435 U.S. at 322–23.

Congress has also distinguished between "tribes" and a "territory or possession of the United States" in statutes passed relatively close in time to the PKPA's passage in 1980. The Indian Child Welfare Act, enacted two years before the PKPA in 1978, distinguished between tribes and a "territory or possession of the United States" setting forth that: "[t]he United States, every State, *every territory or possession of the United States, and every Indian tribe* shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity." 25 U.S.C. § 1911(d) (emphasis added). "[T]he separate listing of territories, possessions and Indian tribes in the Indian Child Welfare Act provides an indication that Congress did not view these terms as synonymous." Wilson v. Marchington, 127 F.3d 805, 809 (9th Cir. 1997). The 1994 Full Faith and Credit statute for child support orders also distinguished between territories and tribes defining "State" as: "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, *the territories and possessions of the United States, and Indian country* (as defined in section 1151 of title 18)." 28 U.S.C. § 1738B(b)(9) (emphasis added). Similarly, the 1994 Violence

Against Women Act set forth that "[a]ny protection order issued that is consistent with . . . this section by the court of one *State, Indian tribe, or territory* . . . shall be accorded full faith and credit by the court of another State, Indian tribe, or territory." 18 U.S.C. § 2265 (emphasis added).

When reviewing the PKPA alongside of other contemporary full faith and credit statutes, it appears that Congress views a "territory or possession of the United States" as distinct from an Indian tribe. While it might have better served Congress's purposes to extend the PKPA to tribes, Congress did not write a definition of "state" in the PKPA broadly enough to apply to Indian Tribes. See 28 U.S.C. § 1738A. Fathers' claim that "a territory or possession of the United States" includes Indian tribes is belied by the common and longstanding use of these terms in statutes and case law. As one court put it:

> [T]he view of tribes as "territories" for the purposes of full faith and credit statutes appears to have fallen out of favor with most contemporary courts. . . . [R]eading "territories" to mean "tribes" would render superfluous the explicit inclusion of "Indian tribes" in Section 1738[B governing child support orders] and other statutes that on their terms apply to "territories" and also to "tribes."

Garcia, 217 P.3d at 605–06. See also Marchington, 127 F.3d at 809 (concluding that 28 U.S.C. § 1738, which applies full faith and credit to "records and judicial proceedings of any court of any such *State, Territory or Possession,*" "did not extend full faith and credit to the tribes" by its plain language) (emphasis added).

This Court recognizes that this interpretation of the PKPA does not prevent "jurisdictional competition and conflict between [s]tate" and tribal courts over child custody orders. Thompson, 484 U.S. at 177. This Court likewise is heartsick that the ambiguity and split of authority over interpretation of the PKPA has contributed to the prolonged litigation in various courts over custody of C.S.N. and T.R.S. Nonetheless, this Court is bound to interpret and apply the PKPA as it is written, not as how it might or arguably should have been written. See United States v.

Davis, 139 S. Ct. 2319, 2336 (2019) (stating that the role of a court is not to rewrite statutes to achieve results that the court deems more desirable).  Congress can amend the PKPA if it wishes to extend it to Indian tribes.  See Bank Markazi v. Peterson, 578 U.S. 212, 215 (2016).  While it might be futile at this point, Fathers still may seek enforcement of the North Dakota state custody orders from the Cheyenne River Sioux Tribal Court through comity principles.  See Doc. 80-40 at 5 (stating the circumstances in which the Cheyenne River Sioux Tribe will "recognize or grant comity to the order or judgment of a foreign court"); Doc. 1-65 at 13.

### III.    Conclusion and Order

For the reasons discussed, it is hereby

ORDERED that the State Defendants' Motion to Dismiss for Failure to State a Claim, Doc. 90, is granted.  It is further

ORDERED that the Tribal Defendants' Motion for Summary Judgment, Doc. 82, is granted, and the Plaintiffs' Motion for Summary Judgment, Doc. 77, is denied.

DATED this 11th day of May, 2022.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

33